UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:21-cv-01398-CMA-NYW

RE/MAX, LLC, a Delaware limited liability company,

        Plaintiff,

v.

EXP REALTY, LLC, a Washington limited liability
company,

        Defendant.

---

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

---

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ii

CERTIFICATE OF CONFERRAL ..................................................................................... 1

INTRODUCTION ............................................................................................................. 1

STATEMENT OF FACTS ................................................................................................ 2

I.      RE/MAX FRANCHISE AGREEMENTS & EXP'S MODEL ..................................... 2

II.     EXP'S INTERFERENCE WITH RE/MAX FRANCHISE AGREEMENTS ................ 6

        A.      eXp's Improper Interference with the McWernli Franchise
                Agreements ............................................................................................... 7

        B.      eXp's Improper Interference with the KFM Franchise Agreements ............. 9

        C.      eXp's Continuing Efforts to Interfere With RE/MAX Franchise
                Agreements ............................................................................................... 10

III.    RML'S CONFERRAL EFFORTS ........................................................................ 12

ARGUMENT ................................................................................................................. 13

I.      RML MEETS ALL THE PRELIMINARY INJUNCTION REQUIREMENTS ........... 13

        A.      RML Will Suffer Irreparable Harm Unless the Injunction Issues ................ 13

        B.      The Balance of Equities Strongly Favors an Injunction .............................. 16

        C.      The Requested Injunction Will Serve the Public Interest in Protecting
                Contracts ................................................................................................... 17

        D.      RML is Reasonably Likely to Prove that eXp is Tortiously Interfering
                With RE/MAX Franchise Agreements ........................................................ 18

II.     RML SHOULD NOT BE REQUIRED TO POST A BOND .................................... 23

CONCLUSION .............................................................................................................. 24

## **<u>TABLE OF AUTHORITIES</u>**

**CASES**

*A&L Lab.'s, Inc. v. Bou-Matic*, LLC,
  No. CIV.02-4862(PAM/RLE), 2003 WL 21005305
  (D. Minn. Apr. 25, 2003) ................................................................................... 19

*Asbury MS Gray-Daniels, L.L.C. v. Daniels*,
  812 F. Supp. 2d 771 (S.D. Miss. 2011) ......................................................... 18

*Atchison, T. & S.F. Ry. Co. v. Lennen*,
  640 F.2d 255 (10th Cir. 1981) ........................................................................ 18

*Continental Oil Co. v. Frontier Ref. Co.*,
  338 F.2d 780 (10th Cir. 1964) ........................................................................ 18

*Coquina Oil Corp. v. Transwestern Pipeline Co.*,
  825 F.2d 1461 (10th Cir. 1987) ...................................................................... 23

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*,
  356 F.3d 1256 (10th Cir. 2004) ................................................................. 14, 16

*Dry Cleaning To-Your-Door, Inc. v. Waltham Ltd. Liab. Co.*,
  No. 07-cv-01483-WDM-MJW, 2007 WL 4557832
  (D. Colo. Dec. 20, 2007) ................................................................................ 24

*Escape Enters.., Ltd. v. Gosh Enters., Inc.*,
  Nos. 04AP-834, 04AP-857, 2005 WL 1252504
  (Ohio Ct. App. May 26, 2005) ........................................................................ 20

*Grease Monkey Int'l v. Montoya*,
  904 P.2d 468 (Colo. 1995) ............................................................................. 23

*Heavener Ogier Servs., Inc. v. R. W. Fla. Region, Inc.*,
  418 So.2d 1074 (Fla. Dist. Ct. App. 1982) ..................................................... 19

*Heideman v. South Salt Lake City*,
  348 F.3d 1182 (10th Cir. 2003) ........................................................... 13, 18, 19

*Home Shopping Club, Inc. v. Roberts Broadcasting Co. of Denver*,
  961 P.2d 558 (Colo. App. 1998) ..................................................................... 17

*Husky Ventures, Inc. v. B55 Investments, Ltd.*,
  911 F.3d 1000 (10th Cir. 2018) ...................................................................... 19

ii

*Lufti v. Brighton Cmty. Hosp. Ass'n*,
   40 P.3d 51 (Colo. App. 2001)........................................................................... 20

*Mich. v. U.S. Army Corps of Eng'rs*,
   667 F.3d 765 (7th Cir. 2011)................................................................... 13, 14

*Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*,
   311 F. Supp. 2d 1048 (D. Colo. 2004) .......................................................... 21

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*,
   290 F.3d 578 (3d Cir. 2002) ......................................................................... 17

*PCVT Gold, Inc. v. SpeedNet, LLC*,
   508 F.3d 1137 (8th Cir. 2007)....................................................................... 18

*Ravenstar, LLC v. One Ski Hill Place, LLC*,
   2017 CO 83.................................................................................................... 17

*Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.*,
   455 F. Supp. 2d 399 (D. Md. 2006)............................................................... 21

*Siener v. Zeff*,
   194 P.3d 467 (Colo. App. 2008)..................................................................... 23

*Thornton v. Kaplan*,
   937 F. Supp. 1441 (D. Colo. 1996) ............................................................... 20

*Warne v. Hall*,
   2016 CO 50.................................................................................................... 22

*Wear-Ever Aluminum Inc. v. Townecraft Indus., Inc.*,
   75 N.J. Super. 135 (1962) ............................................................................. 20

**RULES**

F.R.C.P. 65................................................................................................... 1, 25

**OTHER AUTHORITIES**

11A Charles Alan Wright, et al.,
   *Federal Practice and Procedure* § 2948.1 (2d ed. 1995) ............................. 13

Restatement (Second) of Torts § 766.............................................................. 21

Plaintiff RE/MAX, LLC ("RML") respectfully submits this Motion for Preliminary Injunction[1] pursuant to Federal Rule 65(a) to prevent Defendant eXp Realty, LLC ("eXp") from further interfering with RML's exclusive franchise agreements with RE/MAX® franchisees.[2]

## **CERTIFICATE OF CONFERRAL**

Pursuant to D.C.COLO.LCivR 7.1, RML has conferred with and provided notice to eXp's counsel regarding this Motion. eXp opposes this Motion.

## **INTRODUCTION**

RML brings this tortious interference action to protect its franchise system, reputation, brand, and goodwill from a sustained and ongoing unlawful attack by its competitor, eXp. RML has franchise agreements with its franchisees containing specified terms—typically five years. During the term, the franchisees must operate their offices and promote the RE/MAX brand and business, and they are prohibited from competing with RE/MAX. Despite these clear obligations, in the past several months, three groups of RE/MAX franchisees in New Jersey and South Carolina have abandoned their franchises, in violation of their franchise agreements, to join eXp. eXp is the cause of these breaches. eXp actively incentivizes and encourages its agents to recruit, solicit, and persuade

---

[1] RML filed an unopposed motion for excess pages (to 25 pages) to Magistrate Judge Nina Y. Wang. RML assumes that motion will be transferred to the Court, and, to avoid duplicative filings, does not re-file it. Although that motion remains pending and/or may not yet have been transferred, given the urgency associated with this injunction request, RML proceeds with the instant Motion. If the request for additional pages is denied, RML will withdraw this Motion and re-file within page limits.

[2] For the sake of clarity, in this Motion and supporting declarations, "RML" refers to the plaintiff, RE/MAX, LLC, the corporate entity; and "RE/MAX" refers to RE/MAX, LLC's RE/MAX® brand and franchise system.

RE/MAX franchisees to join eXp, without any regard for their exclusive franchise agreements. RML has repeatedly informed eXp of the exclusive nature of the RE/MAX franchise agreements and has alerted eXp to repeated instances of improper solicitations by its agents. Yet eXp refuses to stop its unlawful business practices.

RML seeks an injunction to stop the imminent and irreparable harm threatened by eXp's widespread poaching efforts. Just last week, one of the former RE/MAX franchisees in New Jersey who improperly joined eXp boasted in a public forum that RE/MAX wants it franchisees to be "little sheep" who follow the "rules," but he intends to "get" RE/MAX's franchisees and "get them to join eXp." And as RML's investigation has intensified, franchisees from across the country have reported constant solicitations by eXp agents, who have been offering financial incentives for RE/MAX franchisees to abandon RE/MAX and join eXp. Absent injunctive relief, RML will suffer irreparable harm to its franchise system, reputation, brand, and goodwill—incalculable harms that cannot be adequately remedied through money damages.

## STATEMENT OF FACTS

**I.    RE/MAX FRANCHISE AGREEMENTS & EXP'S MODEL**

1.    Founded in Denver in 1973, RML is a leading global franchisor of real estate brokerage services under the RE/MAX® brand, with over 135,000 real estate agents and a presence in more than 110 countries and territories. RML is principally based in Colorado, but its independently owned and operated franchisees have offices throughout the United States. Those franchisees benefit from the RE/MAX brand, the goodwill

associated with the brand, the strength of the RE/MAX franchise network, and RE/MAX's reputation as a highly productive real estate network. (Ex. 1, ¶ 2.)

2.      As part of its franchise system, RML enters into binding franchise agreements with franchisees, also known as broker/owners. RML's franchise agreements are the product of arms-length negotiations between sophisticated parties, and represent bargained-for rights, benefits, and obligations between RML and its franchisees. (*Id.*, ¶ 3.)

3.      All franchise agreements have terms of specific length. (*Id.*, ¶ 4.) Throughout their term, franchisees: (1) must operate their franchise and promote and enhance the RE/MAX brand; (2) cannot compete with RE/MAX by affiliating with a real estate competitor; and (3) are not authorized to unilaterally abandon, surrender, or transfer control of their franchises. (Ex. 2, preamble; §§ 1; 2.A.(1), (3); 2.B.; 4.A.(3); 5.F.; 8.B.; 12.B.; 13.A., B.(4); Ex. 1, ¶ 4.) These provisions are designed to promote stability in RE/MAX's franchise system and preserve the RE/MAX brand, reputation, and goodwill. (Ex. 1, ¶ 4.)

4.      eXp is a cloud-based real estate brokerage company that operates nationwide and conducts real estate business throughout Colorado. eXp is a RE/MAX competitor. (*Id.*, ¶ 5.)

5.      eXp operates and generates revenue through agents who act on eXp's behalf and earn commission-based compensation. (*Id.*, ¶ 6.)

6.      eXp's 2020 Independent Contractor Agreement ("ICA"), available online,[3]

contains the following provisions, among others:

    a.  "Contractor understands that Company is legally accountable for the activities of the Contractor" (Ex. 3 at 3);

    b.  "Contractor shall not be affiliated with a competing firm" (*id.* at 6);

    c.  "Contractor acknowledges that all agency relationships entered into for any real estate transactions exist solely between the Company and the client" (*id.* at 8);

    d.  "Contractor agrees to abide by the Company's Policies and Procedures," which are incorporated into the ICA by reference (*id.* at 11);

    e.  Contractors are required to pay eXp a Sign-Up Fee, a monthly Cloud Brokerage Fee, and a Broker Review Fee and Risk Management Fee for each transaction (*id.* at 27);

    f.  eXp receives 20% of every commission earned by the Contractors (*id.* at 27-28); and

    g.  eXp offers its agents an Equity Incentive Plan pursuant to which eXp issues company stock to agents as payment of 5% of the commission compensation the agents earn (*id.* at 44-45).

7.      eXp's business model is a pyramid scheme that depends on eXp agents

endlessly recruiting new agents to join eXp. To that end, under the ICA, eXp automatically

enrolls its agents in a Sustainable Revenue Share Plan that compensates them a

percentage of commissions earned by new agents they recruit to eXp as a "sponsor," a

percentage of commissions earned by agents whom the new agents recruit to eXp, and

so forth, down seven tiers of succession. (*Id.* at 16.) That is, an eXp agent who recruits

---

[3] RML requested that eXp provide a copy of eXp's current form ICA; as of this filing, eXp has not complied. RML will be seeking the Court's leave to conduct expedited discovery before the hearing on this Motion and reserves the right to supplement the evidence supporting it.

and sponsors Agent A is compensated not only for Agent A, but also for Agent A's recruit, Agent B; Agent B's recruit, Agent C; Agent C's recruit, Agent D; Agent D's recruit, Agent E; Agent E's recruit, Agent F; and Agent F's recruit, Agent G.

8.      Agent recruitment is so central to eXp's business model that eXp requires its agents to abide by its Agent Attraction Universal Pledge and Agent Attraction Success Strategy (together, the "Agent Attraction Pledge"). (Exs. 4-5.) This Pledge requires eXp agents to follow 12 best practices and refrain from 16 prohibited practices in their recruitment of prospective eXp agents. (Ex. 4.) eXp's Policies and Procedures, which are incorporated into the ICA, expressly incorporate the Agent Attraction Pledge (Ex. 6 at 17.)

9.      Critically, although eXp details its relationship with its agents in the ICA, and requires them to abide by both eXp's Policies and Procedures Manual and eXp's Agent Attraction Pledge, none of these company documents prohibit eXp's agents from soliciting or encouraging any prospective eXp agent to breach their binding contract with a third party to join eXp. (*See* Exs. 3-6.) Indeed, of the 16 prohibited practices in the Agent Attraction Universal Pledge, ranging from "sending bulk or mass email communications" to posting opportunities on third-party internet employment websites like LinkedIn, tortiously interfering with third party contracts is conspicuously absent. (*See* Ex. 4 at 3-4.)

10.     Moreover, when eXp successfully attracts an agent and the agent has "a brokerage to wind down or a team to bring over," the prospective agent is required to sign eXp's Letter of Intent ("LOI") form. (Ex. 7 at 2.) The LOI form and the application it links to do not ask the prospective agent whether joining eXp would violate the agent's contract with his or her brokerage. (*See* Ex. 8.)

II.     **EXP'S INTERFERENCE WITH RE/MAX FRANCHISE AGREEMENTS**

11.     For several years, eXp has attempted to induce RE/MAX franchisees during the term of their franchise agreements to abandon their franchises, in breach of their franchise agreements, and join eXp. (Ex. 1, ¶¶ 7-8 (discussing Exs. 9-13, 15).) Until recently, those efforts have largely been unsuccessful. (*Id.*)

12.     In response to many of these improper solicitations, RML repeatedly communicated to eXp's leadership that eXp's conduct is improper, that the RE/MAX franchisees have contractual obligations to RML through ongoing franchise agreements with specified terms, and insisted that eXp immediately refrain from further solicitation and interference. (Ex. 16; Ex. 1, ¶ 9.)

13.     eXp responded to these letters by denying responsibility for its agents' actions and stating that such conduct violates eXp's ICA and policies and procedures. (Ex. 17; Ex. 1, ¶ 10.) Tellingly, eXp has never indicated that it has taken disciplinary action against the agents in question. (*See* Ex. 17.)

14.     Instead of ceasing further solicitation and interference, eXp recently has intensified its solicitation and interference efforts, causing several RE/MAX franchisees to abandon their franchises, in breach of their franchise agreements, and join eXp. (Ex. 1, ¶ 11.) For example, in or around late 2020 or early 2021, eXp improperly induced Greg Sisson, a RE/MAX franchisee in South Carolina, to abandon his franchise, in breach of his franchise agreement, and join eXp. (Exs. 16, 18.)

**A.     eXp's Improper Interference with the McWernli Franchise Agreements**

15.     In March 2021, RML learned that eXp was improperly inducing several RE/MAX franchisees—McWernli Properties, Inc., and its owners Christopher Walsh and Christian Giamanco (together, the "McWernli Franchisees")—to abandon their two RE/MAX franchises in New Jersey and join eXp, in violation of their franchise agreements (the "McWernli Franchise Agreements"). (Ex. 1, ¶ 12.)

16.     The McWernli Franchise Agreements contain the standard provisions discussed in Paragraph 3, above; and their terms continue through December 21, 2023 and March 31, 2025, respectively. (Ex. 2 at 52; and preamble; §§ 1; 2.A.(1), (3); 2.B.; 4.A.(3); 5.F.; 8.B.; 12.B.; 13.A., B.(4); Ex. 19 at 52 and same provisions.) Mr. Walsh and Mr. Giamanco are bound by the McWernli Franchise Agreements through the Guaranty and Assumption of Obligations they executed. (Exs. 2 & 19, final pages.)

17.     For over a decade, the McWernli Franchisees successfully operated their RE/MAX franchise locations in New Jersey, building a strong RE/MAX customer base and promoting the RE/MAX brand and reputation. In 2020 alone, the McWernli Franchisees and their 41 sales associates closed on 888 real estate transactions as RE/MAX Real Estate Leaders, and Mr. Walsh was RE/MAX's number one individual agent in New Jersey. (Ex. 1, ¶¶ 13-15.)

18.     When RML learned of eXp's improper inducement of the McWernli Franchisees, RML sent eXp a letter stating that the McWernli Franchisees were contractually bound to their Agreements; insisting that eXp immediately refrain from further inducements of the McWernli Franchisees; and reminding eXp of its history and

pattern of attempting to induce RE/MAX franchisees to violate their franchise agreements. (Ex. 20.) eXp responded by letter on April 8, 2021, stating that Mr. Walsh told eXp that on the advice of his counsel, he had no further obligations to RML. (Ex. 21.) RML promptly replied that Mr. Walsh was "legally and factually wrong" and reiterated that he and Mr. Giamanco's franchise agreements "extend for many more years." (Ex. 22.)

19.     Despite RML's communications, eXp did not stop its solicitation of the McWernli Franchisees. In March, seven sales associates with the McWernli Franchisees changed their affiliation to eXp. (Ex. 23.) And on April 19, 2021, the McWernli Franchisees sent RML a letter containing a purported notice of abandonment of their franchisees, effective immediately. (Ex. 24.)

20.     The McWernli Franchisees are no longer operating their franchises as required by the McWernli Franchise Agreements. Instead, they joined eXp, together with their team of 41 sales associates. (Ex. 1, ¶¶ 17-18.) In a press release announcing their move, Mr. Walsh said:

> Joining forces with eXp Realty, LLC allows our agents to bring this modern approach into practice alongside our strong, traditional, community-based strategies. . . . **We will be combining forces with several other broker/owners in the very near future. Stay tuned for what's next. It's going to be massive.**

(Ex. 25 at 1.) (emphasis added).) For his part, Mr. Giamanco said: "When I saw the model of eXp Realty, LLC and what it could bring to our agents' businesses and clients, it was clear we had to take the leap." (*Id.*)

21.     Mr. Walsh also touted his departure from RE/MAX on Instagram:

> 🔥  Major Industry Announcement! . . . We proudly announce that after 14 years with RE/MAX, we have solidified a new beginning as the area's

largest real estate Mega Icon Team joining the eXp Realty Global Network.
This is an upgrade of epic proportion for The Real Estate Leaders platform. .
. . eXp is absolutely the way of the future . . . .

(Ex. 26.)

### B.    eXp's Improper Interference with the KFM Franchise Agreements

22.    In May 2021, RML learned that eXp had contacted and improperly induced

another group of RE/MAX franchisees in New Jersey—KFM, LLC and Allison and Gene

Krutyansky ("the KFM Franchisees")—to abandon their two RE/MAX franchises in New

Jersey, in violation of their franchise agreements (the "KFM Franchise Agreements"). (Ex.

1, ¶ 19.)

23.    The KFM Franchise Agreements contain the standard provisions discussed

in Paragraph 3, above; and their terms continue through December 22, 2021 and March

25, 2022, respectively. (Ex. 27 at 54; and preamble; §§ 1; 2.A.(1), (3); 2.B.; 4.A.(3); 5.F.;

8.B.; 12.B.; 13.A., B.(4); Ex. 28 at 54 and same provisions.) The Krutyanskys are bound

by the KFM Franchise Agreements through the Guaranty and Assumption of Obligations

they executed. (Exs. 27-28, final pages thereto.)

24.    In April 2021, 51 of the KFM Franchisees' sales associates departed the

franchises and converted to eXp. (Ex. 29.) On May 3, 2021, the KFM Franchisees sent

RML a letter containing a purported formal notice of abandonment of their RE/MAX

franchises, effective immediately. (Ex. 30.) The KFM Franchisees then joined their sales

associates at eXp. (Ex. 1, ¶ 23.)

25.    After the KFM Franchisees gave RML notice, one of their sales associates

took to Facebook to announce that he would be joining them at eXp:

> Had to be quiet about this for some time! Finally I can let you all know I made the switch to exp. . . . I would also like to wish Gene Krutyansky the best of luck on this new venture I know was hard for him to wrap his head around [sic]!

(Ex. 31.)

### C.    eXp's Continuing Efforts to Interfere With RE/MAX Franchise Agreements

26.    eXp's interference with RML's exclusive franchise agreements extends beyond the McWernli and KFM Franchisees to RE/MAX franchisees throughout the country. In April, eXp hosted a "What to EXPect" presentation at the office of a RE/MAX franchisee in Florida who is rumored to be considering abandoning his three RE/MAX franchises early to join eXp. (Ex. 1, ¶ 21.) RML again sent a letter to eXp demanding that eXp cease its solicitation of the franchisee and explaining that if the franchisee abandons his RE/MAX franchises early, he would be in breach of his franchise agreements. (Ex. 32.) eXp responded in what has become characteristic fashion—denying responsibility and refusing to discipline its agents or otherwise take corrective action. (Ex. 33.)[4]

27.    On May 3, 2021, a RE/MAX franchisee in Texas received an email from a former RE/MAX sales associate for 32 years who joined eXp in 2018, telling him that the "move has been life changing for us in the best way" and offering to "mentor, coach and partner with" him to "help [his] business grow." (Ex. 35.) When RML learned of this, it sent eXp yet another letter explaining that the franchisee "has binding franchise agreements

---

[4] eXp emphasized in its letter that the franchisee denied the rumors that he is planning to abandon his RE/MAX franchises. (*Id.*) However, the McWernli Franchisees also denied rumors that they were planning to abandon theirs. (Ex. 34.) Then they did so.

that extend for several more years." (Ex. 36.) eXp's response was not worth the computing power it took to send. (Ex. 37.)

28.     On May 20, 2021, Adam Contos, RE/MAX Holdings' Chief Executive Officer, sent an email to RE/MAX's franchisees informing them that RML had filed this lawsuit against eXp. Mr. Contos received multiple responses from RE/MAX franchisees who confirmed that they, too, are being solicited by eXp. (Ex. 38.) Among the responses Mr. Contos received, a RE/MAX franchisee in North Carolina sent him three emails she received from an eXp Commercial agent on May 5, 13, and 21, 2021, highlighting the purported advantages of eXp's cloud-based business model. (Ex. 39; Ex. 40, ¶ 2-6.) And a RE/MAX franchisee in Georgia forwarded a May 22, 2021 email he received from an eXp agent, formerly of RE/MAX, who asked the franchisee to watch a video entitled "Why I'm not REMAX or Keller Williams now" and give him a call. (Ex. 41.)

29.     In addition to email solicitations, eXp agents have offered RE/MAX franchisees financial incentives to abandon RE/MAX and join eXp. A RE/MAX franchisee in Virginia has been contacted by an eXp agent numerous times in the past two months about joining eXp, even though the eXp agent knows she is under contract with RML. (Ex. 42, ¶¶ 2-3.) The eXp agent encouraged her to close down one of her franchises and bring her sales associates with her, emphasizing eXp's agent recruitment incentives. (*Id.*, ¶ 5.) Another RE/MAX franchisee in Virginia has been contacted by multiple eXp agents about moving over to eXp, even though they know about his franchise agreements. (Ex. 43, ¶¶ 2-3.) Two eXp agents who were formerly the RE/MAX franchisee's sales associates have emphasized eXp's "buy-out options," which he took to mean options for buying out the

remainder of his franchise agreements with RE/MAX so he could join eXp. (*Id.*, ¶¶ 5-6.) They further suggested that the franchisee would benefit from eXp's recruitment compensation incentives set forth in its Sustainable Revenue Share Plan, discussed above, because he would receive compensation for bringing over his entire team of sales associates. (*Id.*, ¶ 6.)

30.     eXp's agents have been unabashed about their intent to interfere with RML's franchise agreements. On May 20, 2021, Mr. Walsh and Mr. Krutyansky hosted an eXp event in New Jersey. During the event, Mr. Krutyansky said:

> Why do you think they're [RE/MAX] doing that? Because they're afraid. They want the rest of the broker/owners in New Jersey to be good little sheep and follow along the rules, **until we get to them, and get them over to eXp.**

(Ex. 44 (emphasis added).)[5] Mr. Krutyansky further boasted that he had been able to bring 62 out of the 64 members of his RE/MAX team over with him to eXp. (*Id.*) eXp's Sustainable Revenue Share Plan incentivized and now rewards Mr. Krutyansky for these flagrant violations of his contractual obligations to RML.

## III.   RML'S CONFERRAL EFFORTS

To avoid litigation regarding a preliminary injunction, RML asked eXp to provide notice, via email, to all eXp agents directing them to cease and refrain from contacting any RE/MAX franchisee for the purpose of soliciting, inducing, or persuading any such franchisee to join eXp and/or abandon its franchise agreement with RML while its franchise agreement remains in effect. (Ex. 45.) In response, eXp's counsel stated eXp

---

[5] RML is mailing a copy of the video to the Court and eXp's counsel on a thumb drive.

"informed employees and independent contractors that eXp Realty cannot onboard a prospective agent if the agent is under contract with an existing brokerage or under noncompete restrictions." (*Id.*) However, eXp has refused to respond to confirm the date of that alleged communication or provide a copy of it, as RML requested. (*Id.*)

## ARGUMENT

It is within the Court's discretion to grant injunctive relief. *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003). The Court should exercise its discretion in RML's favor here to prevent eXp from wrongfully inducing more RE/MAX franchisees to breach their franchise agreements during the pendency of this litigation. RML satisfies all the requirements for a preliminary injunction: (1) RML will suffer irreparable injury unless the injunction issues; (2) the threatened injury to RML is real and significant, and eXp will suffer no damage from the proposed injunction; (3) the injunction, if issued, would not be adverse to the public interest; and (4) RML has shown a reasonable probability of success on the merits. *See id.*

I.      **RML MEETS ALL THE PRELIMINARY INJUNCTION REQUIREMENTS**

A.      **RML Will Suffer Irreparable Harm Unless the Injunction Issues**

The threatened injury to RML from eXp's continuing conduct is real and immediate, and it is also irreparable, as money damages are insufficient to provide RML redress for the threatened harm.

Although an injunction will not be granted to "prevent the possibility of some remote future injury, . . . the injury need not have been inflicted when application is made or be certain to occur." *Mich. v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 788 (7th Cir. 2011) (quoting 11A Charles Alan Wright, et al., *Federal Practice and Procedure* § 2948.1,

at 154-55 (2d ed. 1995)). "A presently existing actual threat" is sufficient. *Id.* Here, eXp is engaged in an ongoing, unlawful nationwide effort to solicit RE/MAX franchisees to disregard their binding franchise agreements and join eXp. This is borne out by the eXp "What to EXPect" event held in April in Florida at the office of a RE/MAX franchisee, and ongoing solicitations of RE/MAX franchisees in Texas, North Carolina, Georgia, and Virginia. (Statement of Facts ("Facts"), ¶¶ 26-29.) And Gene Krutyansky, one of the KFM Franchisees, said just last week in a public forum—following RML's filing of this lawsuit— that RE/MAX wants its franchisees to be "good little sheep" who follow the "rules," but that eXp will "get to them, and get them over to eXp." (*Id.*, ¶ 30.) The threat of harm to RML is real and imminent.

Moreover, the threatened harm to RML is irreparable. Irreparable harm exists where a contractual exclusivity provision is breached, and the resulting damages are either difficult to calculate or are in the nature of intangible harms such as loss of goodwill or competitive market position. *See, e.g., Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1262-64 (10th Cir. 2004) (surveying cases). Here, RML contracts with its franchisees for specific terms. During the term, the franchisees are required to continuously exert their best efforts to operate, promote, and enhance their franchise, including by operating their real estate offices in accordance with the franchise agreements and Brand Identity Manual, which were "established for the purpose of preserving [RE/MAX's] reputation, standards and goodwill." (Facts, ¶ 3.) They are also expressly prohibited from affiliating with a RE/MAX competitor. (*Id.*) These provisions are designed to promote stability in RE/MAX's franchise system and preserve RE/MAX's

brand, reputation, and goodwill. (*Id.*) eXp's ongoing attempts to induce RE/MAX's franchisees to abandon their franchises, if successful, will harm RE/MAX's franchise system, reputation, and business goodwill that RML has spent decades building—none of which can be compensated through calculable money damages. (Ex. 1, ¶ 29.)

The McWernli Franchisees' early abandonment of their franchises demonstrates the irreparable nature of this harm. They are subject to the business promotion and non-competition provisions just discussed. Consistent with those provisions, the McWernli Franchisees successfully operated their RE/MAX franchises for over a decade, building a strong RE/MAX customer base and promoting the RE/MAX brand and reputation. (Facts, ¶ 17.) In 2020 alone, the McWernli Franchisees and their 41 sales associates closed on 888 real estate transactions as RE/MAX Real Estate Leaders, and Mr. Walsh was RE/MAX's number one individual agent in New Jersey. (*Id.*) If the McWernli Franchisees fully performed under the franchise agreements, they would have continued their efforts until December 21, 2023 at their Middletown franchise, and until March 31, 2025 at their Holmdel franchise. (*Id.*) Now, because of their abandonment, RML has lost a cumulative 6.5 years of customer service, business development, and brand and reputation promotion in those areas; the McWernli Franchisees are instead making those efforts on eXp's behalf, directly competing with RE/MAX for market share, promoting the superiority of eXp's model over RE/MAX's in public statements, and recruiting their own sales associates and other RE/MAX franchises to join them. (*Id.*, ¶¶ 19-21.) This harm to RML's competitive position and goodwill is incalculable and irreparable. And if eXp is not

enjoined, RML's harm will compound throughout the country as more RE/MAX franchisees abandon their franchises early.

In short, RML has no plain, speedy, and adequate remedy at law to redress the intangible and incalculable threat of harm to its franchise system, competitive position, and goodwill posed by eXp's ongoing misconduct.

### B.      The Balance of Equities Strongly Favors an Injunction

The "balance of equities" factor considers whether the threatened injury to the movant outweighs the harm to the opposing party resulting from the requested injunction. *See Dominion Video Satellite, Inc.*, 356 F.3d at 1260. Here, the threat of injury to RML is clear and significant, and the threat of injury to eXp is non-existent.

As discussed above, in the absence of injunctive relief, RML will suffer substantial and irreparable harm. In stark contrast, RML's requested injunction will not harm eXp at all. eXp has no cognizable economic, competitive, or other business interest in intentionally and improperly interfering with RML's binding and exclusive franchise agreements. Indeed, in recent correspondence, eXp's Associate General Counsel admitted as much:

> eXp's affiliation with its agents . . . requires that they not tortiously interfere with other contracts, including contracts between other real estate brokerages and their agents and/or franchisees. An agent's alleged breach of the same is . . . in direct contravention of our agreements with them, as well as eXp policies and procedures.

(Ex. 33.) In effect, RML's requested injunction would simply require eXp and its agents to actually comply with eXp's own purported contracts, policies, and procedures. This will not affect eXp's valid business objectives and pursuits in the slightest. And even if eXp

16

could show some threat of injury posed by the requested injunction, that threat of injury "may be discounted by the fact that [eXp] brought that injury upon itself." *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 596 (3d Cir. 2002). For this reason, as well, the balance of equities tips strongly toward RML, warranting injunctive relief.

### C.     The Requested Injunction Will Serve the Public Interest in Protecting Contracts

No conceivable harm to the public interest is posed by RML's requested injunction. RML is not seeking to restrain fair competition between RE/MAX and eXp for prospective RE/MAX franchisees or for existing RE/MAX franchisees who are considering moving over to eXp after their franchise terms expire. RML's sole objective here is to protect its existing, exclusive relationships with its franchisees, and to ensure that its franchisees fully perform under their contracts for the specified term.

In fact, RML's requested injunction would affirmatively <u>serve</u> the public interest. Colorado has a strong public policy of honoring and enforcing contracts. *See, e.g., Ravenstar, LLC v. One Ski Hill Place, LLC*, 2017 CO 83, ¶ 12 ("Contracts between competent parties, voluntarily and fairly made, should be enforceable according to the terms to which they freely commit themselves."). Accordingly, the public interest is served by injunctive relief that allows "the business community . . . to rely on its contractual arrangements and agreements." *Home Shopping Club, Inc. v. Roberts Broadcasting Co. of Denver*, 961 P.2d 558, 562 (Colo. App. 1998) (affirming grant of preliminary

injunction).[6] Here, RML's binding franchise agreements were and are the product of arms-length negotiations between sophisticated parties; they represent bargained-for rights, benefits, and obligations between RML and its franchisees. (Facts, ¶ 2.) The public has an interest in ensuring RML and its franchisees abide by their agreements and in preventing competitors like eXp from inducing RE/MAX franchisees to disregard and abandon those agreements. RML's requested injunction, if granted, would serve this objective.

### D.   RML is Reasonably Likely to Prove that eXp is Tortiously Interfering With RE/MAX Franchise Agreements

The Tenth Circuit has a "liberal definition" of Rule 65's "probability of success" requirement. *Heidemann*, 348 F.3d at 1189. To obtain a preliminary injunction, RML need only demonstrate a "reasonable probability" of success on the merits. *Continental Oil Co. v. Frontier Ref. Co.*, 338 F.2d 780, 781 (10th Cir. 1964). This burden is lower than showing an "overwhelming" likelihood of success, or "positively" establishing a right to relief on the merits. *Atchison, T. & S.F. Ry. Co. v. Lennen*, 640 F.2d 255, 261 (10th Cir. 1981). And where, as here, the three "harm" factors tip "decidedly" in the moving party's favor, the "probability of success requirement" is relaxed further; the moving party "need only show questions going to the merits so serious, substantial, difficult and doubtful, as

---

[6] *See also PCVT Gold, Inc. v. SpeedNet, LLC*, 508 F.3d 1137, 1145 (8th Cir. 2007) (affirming district court's finding that preliminary injunction "promoted the public interest by protecting freedom to contract through enforcement of contractual rights and obligations"); *Asbury MS Gray-Daniels, L.L.C. v. Daniels*, 812 F. Supp. 2d 771, 783 (S.D. Miss. 2011) (preliminary injunction preventing employee from breaching non-competition provision served public interest "in ensuring that parties uphold valid contractual agreements entered into voluntarily and knowingly").

to make them a fair ground for litigation." *Heidemann*, 348 F.3d at 1189. RML satisfies

this low burden.[7]

RML's requested injunction is designed to <u>prevent</u> eXp from intentionally and

improperly inducing current RE/MAX franchisees to breach their franchise agreements. In

this circumstance, RML need not show a breach of its franchise agreements to establish

a likelihood of success; "a tortious interference claim can arise before the breach occurs,

because if a claim only arises after the breach then there would be nothing to enjoin."

*A&L Lab.'s, Inc. v. Bou-Matic*, LLC, No. CIV.02-4862(PAM/RLE), 2003 WL 21005305, at

*3 (D. Minn. Apr. 25, 2003). Consistent with this principle, courts routinely grant injunctive

relief to prevent prospective tortious interference where (1) the plaintiff has a valid

contract; (2) the defendant is aware, or should be aware, of the contract; (3) defendant

nonetheless is intentionally and improperly soliciting the plaintiff's contracting partner to

breach it; and (4) the breach will cause plaintiff irreparable harm. *See, e.g., Husky*

*Ventures, Inc. v. B55 Investments, Ltd.*, 911 F.3d 1000, 1012-14 (10th Cir. 2018)

(affirming injunction against defendant who interfered with plaintiff's contracts and

business relationships in past, and whose conduct "posed a significant risk of continuing

and future" irreparable harm); *Heavener Ogier Servs., Inc. v. R. W. Fla. Region, Inc.*, 418

So.2d 1074, 1075 (Fla. Dist. Ct. App. 1982) (affirming injunction against defendant real

estate franchisor who, despite knowing plaintiff real estate franchisor's franchisees were

---

[7] Even if the Court concludes that the "relaxed" standard does not apply, RML still meets the traditional standard.

required by contract to perform for specified term of years, nonetheless was actively and aggressively soliciting franchisees).[8]

Here, there is no reasonable basis to dispute the validity of the RE/MAX franchise agreements and the specific provisions in question. (Facts, ¶¶ 2-3.) Moreover, eXp knows about RE/MAX's franchise agreements and their exclusivity provisions because RML has informed eXp about them—not once, but ten times. (*Id.*, ¶¶ 12, 14, 18, 26-27.) At the absolute minimum, eXp should know about the franchise agreements and their exclusive terms. *See Lufti v. Brighton Cmty. Hosp. Ass'n*, 40 P.3d 51, 58 (Colo. App. 2001); *see also Thornton v. Kaplan*, 937 F. Supp. 1441, 1458 (D. Colo. 1996) (knowledge element satisfied where defendant possesses "knowledge of facts which would lead the defendant to inquire as to the existence of the contract").

In addition, with full knowledge of RE/MAX's exclusive franchise agreements, eXp is actively and intentionally soliciting RE/MAX franchisees to breach their franchise agreements and join eXp. RML already has ample evidence that eXp's agents directly contact RE/MAX franchisees throughout the country about joining eXp, offering them financial incentives to leave RE/MAX, emphasizing eXp's financial rewards, providing them links to online eXp marketing materials, and sharing testimonials of former RE/MAX franchisees and their sales associates who moved to eXp about the advantages of eXp's

---

[8] *See also Escape Enters.., Ltd. v. Gosh Enters., Inc.*, Nos. 04AP-834, 04AP-857, 2005 WL 1252504, at *2 (Ohio Ct. App. May 26, 2005) (affirming injunction against franchisor engaging in "widespread effort" to induce plaintiff's franchisees to breach their franchise agreements); *Wear-Ever Aluminum Inc. v. Townecraft Indus., Inc.*, 75 N.J. Super. 135, 148 (1962) (granting injunction against defendant corporation that recruited all "key men" from one of plaintiff corporation's divisions prohibiting defendant from "recruiting or attempting to recruit employees, dealers, and distributors of the plaintiff" in the future).

model over RE/MAX's model. (Facts, ¶¶ 26-30.)[9] None of eXp's solicitations inquire about the RE/MAX franchisees' contractual status with RML, even though eXp and its agents, some of whom are former RE/MAX franchisees, are well aware of the exclusive term in the RE/MAX franchise agreements. (*See id.*) This is a concerted, nationwide effort to unlawfully induce RE/MAX franchisees to abandon RE/MAX before their franchise terms expire and join eXp, in violation of the mandatory, specific term and non-competition provisions in the RE/MAX franchise agreements. (*Id.*, ¶¶ 2-3.) So far this year, this effort has caused three RE/MAX franchisees to breach their franchise agreements. (*Id.*, ¶¶ 14, 19-20, 24.)

Moreover, with respect to franchisees whom eXp induces to abandon RE/MAX, eXp works with them to convert the franchisees' sales associates over to eXp before the franchisee attempts to terminate its RE/MAX franchise, in violation of the RE/MAX franchisee's duty to promote the business of the office throughout the term. (Facts, ¶ 3.) Indeed, seven sales associates with the McWernli Franchisees changed their affiliation to eXp before the McWernli Franchisees notified RML of their intent to abandon their franchises, and now 41 McWernli Franchisee sales associates have gone over to eXp. (*Id.*, ¶¶ 19-20.) The KFM Franchisees did the same thing. In the month before they provided RML notice of their purported abandonment, 51 of their sales associates left the

---

[9] *See Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048, 1120 (D. Colo. 2004) (finding inducement where contracting party was "influenced" by defendant to break the contract); Restatement (Second) of Torts § 766 cmt. m ("Another method of inducing B to sever his business relations with C is to offer B a better bargain than that which he had with C."); *Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.*, 455 F. Supp. 2d 399, 427–28 (D. Md. 2006) ("[O]ffering attractive terms is a method" of inducing breach of contract).

KFM franchises and joined eXp. (*Id.*, ¶ 24.) During his recent presentation, Gene Krutyansky boasted that 62 out of 64 members of his team made the move with him to eXp. (*Id.*, ¶ 30.) This additional breach by RE/MAX franchisees gives eXp a fully-staffed brokerage from the moment the RE/MAX franchisee converts and leaves RE/MAX's franchise stripped out. And eXp actively incentivizes the abandoning RE/MAX franchisees to bring over their sales associates by compensating the abandoning RE/MAX franchisees through the Sustainable Revenue Share Plan. (*Id.*, ¶¶ 7, 29.)

It is also plain that eXp is acting "improperly" here. The Court should consider (1) the nature of eXp's conduct, (2) eXp's motive, (3) RML's interests, (4) the interests sought to be advanced by eXp, (5) the social interests in protecting the freedom of eXp's action and the contractual interests of RML, (6) the proximity or remoteness of eXp's conduct to the interference, and (7) the relation between the parties. *See Warne v. Hall*, 2016 CO 50, ¶ 25.

RML has sent at least ten letters to eXp in response to documented instances of eXp improperly soliciting RE/MAX franchisees to abandon their franchises and join eXp. In each one, RML explained that the RE/MAX franchisees are bound by contract to operate their franchises through a specified term and their early abandonment would or does constitute a breach of those agreements. (Facts, ¶¶ 12, 18, 26-27.) Instead of taking corrective action, eXp has simply disclaimed knowledge of, and responsibility for, the actions of its agents. (*Id.*, ¶¶ 13, 18, 26-27.)[10] The reality is, eXp incentivizes this

---

[10] Any argument by eXp that it cannot be held liable for the acts of its independent contractor agents fails. As demonstrated by eXp's ICA, which incorporates eXp's Policies and Procedures and its Agent Attraction Pledge, eXp directs, in detail, the conduct of its

misconduct, eXp knows it is happening, eXp is empowered to instruct its agents to stand down, and yet eXp refuses to do so. (*Id.*, ¶¶ 6-10, 12, 14, 18, 26-27.) Indeed, this Motion became necessary when eXp refused RML's repeated reasonable requests that eXp instruct its agents to stop soliciting RE/MAX franchisees to abandon their franchises early. (Ex. 45.) eXp's motives are obvious: getting an unfair competitive advantage over RML in the real estate market, undermining RE/MAX's franchise system, and leveraging the skills, goodwill, and customer base RE/MAX helps franchisees develop for its own benefit. And, for the reasons discussed, this conduct frustrates RML's legitimate contractual rights, and is contrary to the strong societal interest in protecting contracts. Given these considerations, eXp's conduct is improper.

For these reasons, RML is reasonably likely to prevail on its claim against eXp for intentionally interfering with RML's contractual relationships with its franchisees.

## II.   RML SHOULD NOT BE REQUIRED TO POST A BOND

Under Rule 65(c), courts have wide discretion in determining whether to set a preliminary injunction bond, and the bond amount. *See* Fed. R. Civ. P. 65(c); *Coquina Oil*

---

agents in how they recruit prospective eXp agents (while conspicuously omitting restrictions on tortious interference). (Facts, ¶ 6, 8-9) Thus, eXp's agents act within the scope of their agency when they recruit RE/MAX franchisees to eXp. *See Grease Monkey Int'l v. Montoya*, 904 P.2d 468, 473 (Colo. 1995) ("Acts that are apparently authorized or committed within an agent's inherent powers or where the agent's position enables him to commit a tort exemplify the situations where a principal may be liable for the torts of servants and non-servant agents.") In addition, eXp financially incentivizes its agents to recruit agents, regardless of whether they are bound by third-party contracts. (Facts, ¶ 7.) And eXp ratifies these unlawful solicitation efforts by accepting fees and other benefits from RE/MAX franchisee recruits. *See Siener v. Zeff*, 194 P.3d 467, 472 (Colo. App. 2008) ("Ratification may occur if a principal accepts the benefits resulting from the unauthorized act.").

*Corp. v. Transwestern Pipeline Co.*, 825 F.2d 1461, 1462 (10th Cir. 1987) (trial court may, in exercise of discretion, determine bond is unnecessary to secure preliminary injunction "if there is an absence of proof showing a likelihood of harm").

Here, for the reasons discussed, eXp will not suffer any harm if the Court grants the requested preliminary injunction. The preliminary injunction will preserve the status quo by restoring the parties to the "last peaceable position" existing between them before the dispute developed. *Dry Cleaning To-Your-Door, Inc. v. Waltham Ltd. Liab. Co.*, No. 07-cv-01483-WDM-MJW, 2007 WL 4557832, at *2 (D. Colo. Dec. 20, 2007). The last peaceable position was the world as it existed before eXp began unlawfully and systematically interfering with RML's exclusive franchise agreements. An injunction barring this conduct will not affect eXp's legitimate business interests. Therefore, an injunction bond is unnecessary.

## **CONCLUSION**

For the foregoing reasons, RML respectfully requests that the Court set this matter for a prompt hearing and immediately enjoin eXp, including its agents, from contacting by email, text message, mail, telephone call, personal visit, social media, or otherwise any RE/MAX franchisee for the purpose of soliciting, inducing, or persuading any such franchisee to abandon its franchise agreement with RML before the specified term expires. A proposed order is attached hereto.

Dated:  May 28, 2021                    Respectfully submitted,


                                        s/ Kathryn A. Reilly
                                        Kathryn A. Reilly
                                        Thomas A. Olsen
                                        Melissa L. Romero
                                        Wheeler Trigg O'Donnell LLP

                                        Attorneys for Plaintiff RE/MAX, LLC


**CERTIFICATE OF SERVICE (CM/ECF)**

I HEREBY CERTIFY that on May 28, 2021, I electronically filed the foregoing **PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following email addresses:

- **Janette L. Ferguson**
  jferguson@williamsweese.com

- **Jeff Lippa**
  jlippa@williamsweese.com

- **Jessica Marsh**
  jmarsh@williamsweese.com


                                        s/ Claudia Jones

25